**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

## 24-60187-CR-DIMITROULEAS/HUNT

Case No. _____

21 U.S.C. § 846
21 U.S.C. § 841(a)(1)
21 U.S.C. § 843(b)
21 U.S.C. § 853

FILED BY_____MP_____D.C.

**Sep 20, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNITED STATES OF AMERICA**

**vs.**

**JASON W. SMITH,**
**CASSANDRA RIVERA, and**
**JOSEPH PESSERILLO,**

        **Defendants.**
_____/

### INFORMATION

The United States Attorney charges:

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise specified:

### Introduction

1.     **JASON W. SMITH** owned and operated Proven Rx Sales, LLC ("Proven"), a South Florida-based pharmaceutical consulting firm that helped distributors sell opioids and other commonly abused pills to pharmacies. **CASSANDRA RIVERA** and **JOSEPH PESSERILLO** were Proven sales representatives, also based in South Florida.

2.     **JASON W. SMITH, CASSANDRA RIVERA,** and **JOSEPH PESSERILLO** knew and understood that Proven's pharmacy customers purchased opioids and other commonly abused pills to unlawfully sell and distribute them (to "divert" them) onto the black market. Most of Proven's pharmacy customers were located within around 50 miles of Houston, Texas, which

**SMITH, RIVERA, PESSERILLO**, and the drug distributors they represented knew was a diversion "hot zone."

3.     In addition to helping distributors identify and engage pharmacies seeking the drugs, Proven instructed its distributor clients on how to maximize profit and minimize risk by charging the pharmacies over-market prices, restricting the quantities of commonly abused drugs the pharmacies could order, requiring them to purchase maintenance drugs they neither needed nor wanted, and documenting purported compliance measures undertaken strictly for appearances.

4.     In this way, Proven and its drug distributor clients made millions of dollars funneling drugs of abuse to pharmacies that **JASON W. SMITH, CASSANDRA RIVERA, JOSEPH PESSERILLO**, and their drug distributor clients knew distributed and dispensed the drugs outside the usual course of professional practice and without any legitimate medical purpose, and by other means not authorized by law.

### Distributors' Obligations Under the Controlled Substances Act

5.     The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance, "except as authorized" under Title 21, United States Code.

6.     The Drug Enforcement Administration ("DEA") enforced the CSA and its implementing regulations by, among other things, approving registrations for manufacturers and distributors of controlled substances. A DEA registration authorized transactions within the legitimate distribution chain. Manufacturers, distributors, or other individuals registering with the DEA were referred to as "registrants."

2

7.      The DEA performed its distributor-related oversight functions by conducting audits and inspections, reviewing sales data and suspicious order reports, and bringing enforcement actions against registrants that failed to comply with the CSA. A distributor was not authorized under the CSA to distribute or dispense controlled substances unless it maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, research, or industrial channels." *E.g.*, 21 U.S.C. § 823(b)(1); *see also* 21 C.F.R. § 1301.71(a).

8.      In addition, the Attorney General's implementing regulations under the CSA required each distributor to design and operate a system to identify suspicious orders of controlled substances and to report suspicious orders to DEA. *See* 21 C.F.R. § 1301.74(b). Suspicious orders included "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

9.      The CSA assigned controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision. Any registrant that received controlled substances with the highest potential of abuse out of the drugs with currently accepted medical uses in treatment in the United States—*i.e.*, those assigned to Schedule II—had to issue a DEA Form 222 to the registrant supplying the drugs. 21 U.S.C. § 828.

10.     It was unlawful for any person to use a DEA Form 222 to obtain "controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research." *Id.* § 828(e). Conversely, it was unlawful for a registrant to distribute a Schedule II controlled substance to any person who the registrant knew or intended was obtaining

3

the controlled substance for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research in the course of his legitimate business. *See* 21 U.S.C. § 843(a)(1).

11.    Just as distributors could sell controlled substances to one another, and to pharmacies, when authorized to do so by law, an appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a doctor or other practitioner acting in the usual course of professional practice. 21 C.F.R. §§ 1306.04, 1306.06.

### The Greater Houston Area

12.    The greater Houston area ("the Houston area") included the following counties in the State of Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

13.    The Houston area was a nationally recognized "hot zone" for purported clinics and pharmacies involved in diverting certain controlled substances onto the black market.

### The Commonly Abused Prescription Drugs

14.    The following controlled substances in Schedule II were most often diverted onto the Houston area's black market:

    a. Hydrocodone was an opioid classified as a Schedule II controlled substance. Hydrocodone was a narcotic analgesic used to treat moderate to moderately severe pain and, like other opioids, was among the most addictive drugs used in medicine. The highest-strength quick-release hydrocodone pill commercially available—and the one most in demand on the Houston area's black market—contained 10 mg of hydrocodone bitartrate and 325 mg of the non-narcotic analgesic acetaminophen. Hydrocodone 10-325 mg combination pills typically had a Houston area street value of around $1 per milligram of hydrocodone.

    b. Oxycodone was an opioid classified as a Schedule II controlled substance. Oxycodone was a more powerful narcotic painkiller than hydrocodone, having

4

twice hydrocodone's potency per milligram. The highest-strength short-acting oxycodone pill commercially available—and the one most in-demand on the Houston area's black market—contained 30 mg of oxycodone hydrochloride. The oxycodone combination pill containing 10 mg of oxycodone hydrochloride and 325 mg of acetaminophen was high in demand on the Houston area's black market. The street value of oxycodone 30 mg pills was approximately $1 per milligram.

c. Hydromorphone was an opioid classified as a Schedule II controlled substance. Hydromorphone was a more powerful narcotic painkiller than oxycodone, typically prescribed when other medication was unsuccessful. The highest-strength short-acting hydromorphone pill commercially available—and the one most in-demand on the Houston area's black market—contained 8 mg of hydromorphone hydrochloride. The street value of hydromorphone 8 mg pills was at least $1 per milligram.

(Collectively, the Schedule II opioids in the strengths described are the "Commonly Abused Opioids.")

15. In addition to the Commonly Abused Opioids, the following controlled substances were also frequently diverted onto the Houston area's black market:

a. Carisoprodol was a Schedule IV controlled substance classified as a muscle relaxant. The highest-strength carisoprodol pill commercially available—and the one most in-demand on the Houston area's black market—was the 350 mg pill. Carisoprodol 350 mg typically sold on the street for $5 or more per pill.

b. Alprazolam was a Schedule IV controlled substance used to treat anxiety. The highest-strength alprazolam pill commercially available—and the one most in-demand on the Houston area's black market—was the 2 mg pill. The street value of alprazolam 2 mg pills was typically $5 or more per pill.

c. Promethazine with codeine was a Schedule V controlled substance classified as a cough suppressant. The street value of a pint of promethazine with codeine syrup was $1,000 or more.

(Collectively, carisoprodol, alprazolam, and promethazine with codeine are "Potentiators," so-called for their reputation on the black market of enhancing the high from the Commonly Abused Opioids.) (Together, the Commonly Abused Opioids and Potentiators are the "Commonly Abused Prescription Drugs.")

5

## DEFENDANTS AND RELEVANT ENTITIES AND INDIVIDUALS

16.     Defendant **JASON W. SMITH** was a broker who resided in the Southern District of Florida. At all relevant times, **SMITH** owned and operated Proven, a purported pharmaceutical consulting company. Proven helped small-to-mid-sized distributors sell Commonly Abused Prescription Drugs to Houston area pill-mill pharmacies. **SMITH**'s role at Proven was mostly to deal with the distributors' owners and upper management. He rarely dealt directly with Proven's Houston area pill-mill pharmacy customers.

17.     Defendants **JOSEPH PESSERILLO** and **CASSANDRA RIVERA**, both of whom resided in the Southern District of Florida, were employed by Proven as sales representatives. They dealt directly with Proven's Houston area pill-mill pharmacy customers on **JASON W. SMITH**'s behalf, usually by phone and email.

18.     Wholesaler A was a distributor with its principal place of business in Michigan. Wholesaler B and Salus Medical LLC ("Salus") were Arizona-based distributors. Wholesaler C was a distributor with its principal place of business in Miami and its primary warehouse in North Carolina (collectively, Salus and Wholesalers A, B, and C are the "Proven Distributors"). The Proven Distributors sold Commonly Abused Prescription Drugs almost exclusively to Houston area independent pharmacies that unlawfully distributed and dispensed them using different schemes, including:

   a. "Traditional" operations, which required individuals to pose as patients to show up, in person, to receive illegitimate prescriptions from complicit doctors and then travel to complicit pharmacies to fill them;

   b. "Counterfeit-prescription" operations, which involved drug trafficking organizations forging prescriptions and identification cards, bringing them to a complicit pharmacy in bulk, and paying large sums of cash for batches of the drugs; and

   c. "Back door" or "ghosting" operations eliminated doctors, patients, and prescriptions altogether and instead relied on established relationships with

6

complicit distributors and their representatives to order as many of the Commonly Abused Prescription Drugs as possible and sold the drugs in bulk, directly to drug traffickers, before shuttering the pharmacy and repeating the process.

(Pharmacies engaged in "traditional," "counterfeit-prescription," or "back door" methods of diversion were known as "pill-mill pharmacies" or "pill mills.")

19.     Chrisco Pharmacy ("Chrisco") was a Houston "back door" pill-mill pharmacy and a major purchaser of Commonly Abused Prescription Drugs from Wholesaler B and Wholesaler C. **CASSANDRA RIVERA** served as Chrisco's direct representative for both Proven Distributors. In 2020, Chrisco—located in a Houston strip mall next to a daycare—was one of the largest pharmacy purchasers of oxycodone 30 mg in the United States.

20.     **JOSEPH PESSERILLO** served as the Proven Distributors' direct representative for the following Houston area pill mills, among others:

a.  K Med Pharmacy ("K Med") was a Houston "back door" pill-mill pharmacy that, through Proven, purchased Commonly Abused Prescription Drugs from Wholesaler A, Wholesaler B, and Wholesaler C.

b.  Pharmacy A was a Houston area "traditional" pill mill that purchased Commonly Abused Prescription Drugs from Salus, Wholesaler A, and Wholesaler C.

c.  Pharmacy B was a Houston area "traditional" pill mill that purchased Commonly Abused Prescription Drugs from Wholesaler C.

(Collectively, K Med, Pharmacy A, and Pharmacy B are the "Pesserillo Pharmacies.") (Together, Chrisco and the Pesserillo Pharmacies are the "Proven Pharmacies.")

### PROVEN'S ROLE IN THE SCHEME TO SELL COMMONLY ABUSED PRESCRIPTION DRUGS TO HOUSTON AREA PILL MILLS

21.     The Proven Distributors retained Proven and compensated the company with substantial commissions for several reasons.

22.     First, Proven provided the Proven Distributors access to sizeable profit margins typically unavailable to distributors of generic pharmaceuticals. Proven's pharmacy customers in

7

the Houston area were willing to pay substantially over-market prices on both the Commonly Abused Prescription Drugs and anything else they were made to purchase for appearances, because the pharmacies still made large profits selling the Commonly Abused Prescription Drugs onto the black market for hundreds or even thousands of dollars in cash per bottle. Retaining Proven meant buying access to the company's customer list, price lists, and specialized knowledge about market preferences, which were based on black-market demands like pill color and not medical efficacy. Hiring Proven also meant access to Proven's built-in sales force, including **CASSANDRA RIVERA** and **JOSEPH PESSERILLO**, who directly serviced the accounts.

23.     Second, the Proven Distributors retained Proven for the company's experience and expertise in staying "under the radar" of regulators and law enforcement while reaping the black-market profits at the end of the Houston area pill-mill pharmacy distribution chain. Proven encouraged the Proven Distributors to implement and enforce the following measures for what **JASON W. SMITH** called "longevity":

   a. "Caps," limiting the number of Commonly Abused Prescription Drugs that a pharmacy could purchase per month;

   b. "Ratios," a purported compliance measure that made the Proven Distributors even more money by requiring customers to purchase four non-controlled pills they neither needed nor wanted (also typically at over-market prices), for every Commonly Abused Prescription Drug pill, even if the pharmacies purchased the same cheap generics, month after month; and

   c. Perfunctory "due diligence" for a paper file, including applications and questionnaires, dispensing reports, and reports from third-party onsite inspections.

24.     **JASON W. SMITH** and the Proven Distributors knew these measures did not actually prevent diversion. In a June 2021 phone call, **SMITH** agreed with a broker colleague that dispensing reports, which the Proven Distributors all collected to document purported compliance, could be "fix[ed]" and were "a fraud anyway."

8

25. Proven and the Proven Distributors knew that without imposed purchasing limits, the Houston area pharmacies would order as many Commonly Abused Prescription Drugs as the Proven Distributors would sell them. "When has it ever been enough?" **CASSSNDRA RIVERA** asked **JASON W. SMITH** rhetorically on a December 2021 call. Proven and the Proven Distributors also knew that Houston area pill mills would not have purchased non-controlled drugs without controlled-to-non-controlled-pill ratio requirements: as **SMITH** explained to his broker colleague in November 2021, "what [Houston area] customer wouldn't love getting half off and not having to order non[-controlled substances]?"

26. Hiring Proven also benefited the Proven Distributors because, as the Houston area pharmacies' primary points of contact, **CASSANDRA RIVERA, JOSEPH PESSERILLO,** and other Proven representatives could and did coach the pharmacies on how to fill out applications to purchase and controlled-drug questionnaires, and how to complete ordering forms and documents with information that would satisfy the Proven Distributors—whether that information was true or, as was often the case, it was not. Proven provided the Proven Distributors a layer of insulation from the unlawful dispensing of Proven Distributors' pill-mill pharmacy customers—*i.e.*, someone to blame in the event of scrutiny.

27. The arrangement between Proven and the Proven Distributors benefited Proven as well. Proven earned sizeable commissions on sales it made for each of the Proven Distributors, and Proven's non-exclusive arrangements with the Proven Distributors meant that with a single phone call, Proven could make sales on behalf of more than one Proven Distributor. In addition, when one of the Proven Distributors could not or would not sell to a particular pharmacy, Proven could and did try with another.

28.    Proven's status as an out-of-state "consulting" company also meant that its name stayed off the paperwork most likely to be reviewed by regulators and law enforcement: Proven never touched the drugs, Proven never visited the pharmacies, and Proven could blame the Proven Distributors' compliance personnel, typically located in another state, in the event of scrutiny.

**Wholesaler B**

29.    Proven sourced more Commonly Abused Prescription Drugs to Houston area pill mills from Wholesaler B than from all the other Proven Distributors combined. The terms of Proven's April 2015 contract with Wholesaler B entitled Proven to commissions of 50% of the net profit on the sales that Proven sales representatives—including **CASSANDRA RIVERA** and **JOESEPH PESSERILLO**—facilitated, an arrangement that made **JASON W. SMITH** around $6.5 million.

30.    In around mid-2016, Wholesaler B's Chief Operating Officer ("COO") filed a complaint and had at least two meetings with the DEA about a former employee who left Wholesaler B to found Salus, another Proven Distributor. The COO specifically named **JASON W. SMITH** as a consultant who worked with Salus's owner to steer Wholesaler B into business with Houston area pharmacies that the COO described as illegitimate.

31.    During the 2016 meetings with DEA, Wholesaler B's COO represented that Wholesaler B had cut off over 80 Houston area pharmacies identified as suspicious, and that Wholesaler B had implemented around a dozen new compliance measures to identify and root out illegitimate pharmacies in the future. But within a month of Wholesaler B's COO first meeting with DEA, Wholesaler B was back to doing business with **JASON W. SMITH** and selling Commonly Abused Prescription Drugs to Houston area pill-mill pharmacies—including several that Wholesaler B's COO identified by name as suspicious and claimed to have cut off.

10

32.     Over the ensuing years, Proven and Wholesaler B continued to ignore numerous red flags that their Houston area customers were diverting the Commonly Abused Prescription Drugs they purchased from Wholesaler B. These red flags included that Wholesaler B's Houston area pharmacy customers:

    a.  Paid substantially over-market prices for the Commonly Abused Prescription Drugs;

    b.  Sometimes refused to purchase based on brand or color, but otherwise would typically order the maximum amount allotted each month;

    c.  Ordered non-controlled substances in precisely the ratio of controlled-to-non-controlled drugs Wholesaler B and Proven set; and

    d.  Expressed little interest in the non-controlled substances that Wholesaler B required them to purchase, which were conveyed to the pharmacies in an (often out of-date) ordering checklist.

33.     Proven sales representatives, including **CASSANDRA RIVERA** and **JOSEPH PESSERILLO**, often selected the non-controlled substances that Wholesaler B's Houston area pharmacy customers needed to purchase to meet ratio.

34.     In conversations between Wholesaler B and Proven about the Houston area pharmacies, the Commonly Abused Prescription Drugs were always the focus. For example, in a March 2021 email, **JOSEPH PESSERILLO** asked Wholesaler B's COO about a Houston area pharmacy applicant generally, "[A]ny update on this new account yet?" Without asking any follow-up questions, the COO responded with monthly purchasing limits on "Oxy[codone 30 mg]," "Hydro[codone 10-325 mg]," "Soma [carisoprodol 350 mg]," "Prometh[azine with codeine]," and "Xanax [alprazolam 2 mg]," and no others.

35.     **JASON W. SMITH, CASSANDRA RIVERA, JOSEPH PESSERILLO,** and Wholesaler B did not cease selling Commonly Abused Prescription Drugs to Houston area pharmacies, even as Proven and Wholesaler B acquired actual knowledge that Wholesaler B's

11

Houston area customers were being shut down, arrested, and convicted of diversion-related crimes. In August 2019, individuals operating several of Wholesaler B and Proven's Houston area customers were arrested in a coordinated law enforcement action that received significant press coverage. In an email to **SMITH** the following month, Wholesaler B's COO wrote, "[W]e [Wholesaler B] were the top seller to [two of the charged pharmacies,] which means I have to be prepared for the DEA to show up at our door and be able to answer all the questions."

36.    From on or about January 1, 2015, through on or about March 31, 2022, of the more than 24.2 million Schedule II pills that Wholesaler B distributed to pharmacies in the United States, more than 99% went to the Houston area. Of those Schedule II pills that went to the Houston area, more than 98% were the Commonly Abused Opioids—*just hydrocodone 10-325 mg, oxycodone 30 mg, and hydromorphone 8 mg*. At around $1 per milligram, the street value of the Commonly Abused Opioids Wholesaler B distributed into the Houston area during that timeframe was around $410 million.

37.    During the same timeframe, Wholesaler B sold millions of pills of the Potentiators carisoprodol 350 mg and alprazolam 2 mg to Houston area pharmacies. At around $5 per pill, the street value of those drugs was around $41.6 million. And Wholesaler B sold Houston area pharmacies over 1,000 gallons of the Potentiator promethazine with codeine syrup, which at $1,000 per pint had a street value of around $8.4 million.

### Wholesaler C

38.    Proven's relationship with Wholesaler C began in 2018, when Proven started using Wholesaler C as a supplemental source of supply for Proven's customers with larger demands for the Commonly Abused Prescription Drugs than Wholesaler B would accommodate.

12

39.      **JASON W. SMITH** knew that supplying Proven's pharmacy customers from Wholesaler C in addition to Wholesaler B would defeat the purpose of Wholesaler B's purchasing limits on Commonly Abused Prescription Drugs. As he explained to a business associate over the phone in October 2020, "if I give [a pharmacy] another vendor [distributor] to order controls from, then what's the point on [the first distributor] having limits?"

40.      There was minimal difference between how Wholesaler C and Wholesaler B did business with Houston area pharmacy customers. Wholesaler C charged over-market prices for the Commonly Abused Prescription Drugs and the non-controlled drugs the pharmacies neither needed nor wanted, but that the pharmacies bought to meet Wholesaler C's ratio requirement. Wholesaler C imposed monthly purchasing limits for the Commonly Abused Prescription Drugs and required Houston pharmacies to complete paperwork for the file.

41.      Wholesaler C's owners and employees, too, were aware that Wholesaler C and Proven's Houston area pharmacy customers, while incredibly profitable for the company, kept getting shut down and arrested for unlawfully selling the Commonly Abused Prescription Drugs. In early December 2021, Wholesaler C's President told **JASON W. SMITH** over the phone that, "I think there's, like, four pharmacies that have either disappeared, you know, or they got shut down, uh, in Texas. So, like, I definitely want to grow everything outside of there." After another coordinated law enforcement action in Houston later that month resulted in arrests at two of Wholesaler C's largest purchasers of Commonly Abused Opioids, Wholesaler C's President reiterated, "[W]e gotta, we gotta get out of Texas and figure some shit out."

42.      From in or around January 2018, through in or around May 2023, Wholesaler C sold over 7.2 million Schedule II pills to pharmacies in the U.S., more than 99% of which went to the Houston area. In addition, more than 99% of the Schedule II pills Wholesaler C sold to the

Houston area were two drugs, in just one strength apiece—the Commonly Abused Opioids hydrocodone 10-325 mg and oxycodone 30 mg. At around $1 per milligram, the street value of the Commonly Abused Opioids that Wholesaler C distributed into the Houston area during that timeframe was around $100 million.

43. During the same timeframe, Wholesaler C sold Houston area pharmacies millions of pills of the Potentiator carisoprodol 350 mg, hundreds of thousands of pills of the Potentiator alprazolam 2 mg, and over 1,300 gallons of the Potentiator promethazine with codeine syrup. At around $5 per pill, the street value of the Potentiators alprazolam 2 mg and carisoprodol 350 mg was around $26.5 million. At around $1,000 per pint, the street value of the Potentiator promethazine with codeine was around $10.7 million.

### Salus

44. **JASON W. SMITH** met Salus's owner when Salus's owner worked for Wholesaler B. The split between Wholesaler B and Salus's owner was acrimonious, and **SMITH** and Proven had to choose whether to stay with Wholesaler B or to go with Salus. **SMITH** chose to stay with Wholesaler B. Meanwhile, Salus's owner established the company as another high-volume distributor of Commonly Abused Prescription Drugs to Houston area pill-mill pharmacies, doing business in essentially the same way as Wholesaler B and Wholesaler C, *e.g.*, charging over-market prices, imposing limits and ratios, and documenting perfunctory compliance.

45. From approximately 2015, through the end of 2020, Salus sold over 13.8 million Commonly Abused Opioid pills into the Houston area, with an estimated street value of over $235 million. During the same timeframe, Salus sold Houston area pharmacies more than 9.6 million alprazolam 2 mg and carisoprodol 350 mg pills and more than 1,200 gallons of promethazine with codeine syrup, Potentiators with a street value of over $57 million.

14

46.     In mid-2021, Wholesaler B ceased doing business with Proven, and **JASON W. SMITH** and Proven began facilitating sales of Commonly Abused Prescription Drugs for Salus. Proven gave Salus's Houston area sales of Commonly Abused Prescription Drugs a boost, and in 2021 and 2022 Salus sold into the Houston area more than 4.5 million additional Commonly Abused Opioid pills, with a street value of around $94 million.

47.     During the same timeframe, Salus sold into the Houston area an additional 1.7 million combined alprazolam 2 mg and carisoprodol 350 mgs pills, with a street value of around $8.7 million; and around 320 gallons of promethazine with codeine syrup, with a street value of over $2.5 million.

### Wholesaler A

48.     In addition to Salus, **JASON W. SMITH** added Wholesaler A to the list of Proven Distributors after Proven split with Wholesaler B. **SMITH** helped Wholesaler A establish a price list for the Houston area and implement the model used by Wholesalers B, C, and Salus for targeting Houston area pharmacies with Commonly Abused Prescription Drugs (*e.g.*, limits, ratios, perfunctory compliance). Proven also provided Wholesaler A with sales representatives—including **JOSEPH PESSERILLO** and **CASSANDRA RIVERA**—to sign up Proven's Houston area pharmacy customers with Wholesaler A and service those accounts.

49.     From in or around August 2021, through in or around March 2023, Wholesaler A, headquartered in Michigan, sold over 2.6 million Schedule II controlled substances, nearly all of them Commonly Abused Opioids—just hydrocodone, oxycodone, and hydromorphone, in one strength apiece—into the Houston area. At around $1 per milligram, the street value of the Commonly Abused Opioids Wholesaler A distributed into the Houston area during that timeframe was around $45 million.

15

50.     During the same timeframe, Wholesaler A sold millions of pills of the Potentiator carisoprodol 350 mg, hundreds of thousands of pills of the Potentiator alprazolam 2 mg, and over 490 gallons off the Potentiator promethazine with codeine syrup. At around $5 per pill, the street value of the Potentiators alprazolam 2 mg and carisoprodol 350 mg that Wholesaler A distributed into the Houston area during that timeframe was around $10.5 million. At around $1,000 per pint, the street value of the Potentiator promethazine with codeine that Wholesaler A distributed into the Houston area during that timeframe was around $3.9 million.

**SALES OF COMMONLY ABUSED OPIOIDS THAT PROVEN FACILITATED BETWEEN THE PROVEN DISTRIBUTORS AND THE PROVEN PHARMACIES**

**Chrisco**

51.     Chrisco was among Proven's Houston area pill-mill pharmacy customers whose accounts **CASSANDRA RIVERA** handled directly. In that role, **RIVERA** used her phone and email to take Chrisco's orders for Commonly Abused Prescription Drugs; create non-controlled substance orders on Chrisco's behalf to ensure Chrisco met Wholesaler B and Wholesaler C's ratio requirements; and ensure that Chrisco's payments—usually via credit card—reached Wholesaler B and Wholesaler C.

52.     **JASON W. SMITH** and **CASSANDRA RIVERA** frequently discussed red flags that suggested Chrisco was diverting Commonly Abused Prescription Drugs purchased from the Proven Distributors, even as Proven continued to facilitate sales of large quantities of them to the pharmacy. On a December 2021 call between **SMITH** and **RIVERA**, **RIVERA** recounted telling the President of Wholesaler C that Chrisco would probably take all the Commonly Abused Prescription Drugs that Wholesaler C would sell the pharmacy, but "[Chrisco] just can't do nothing with those 400,000 nons we send."

16

53. On December 21, 2021, after learning that both the owner-pharmacist and the pharmacy technician at Chrisco had been indicted in the Southern District of Texas for running a "back-door" pharmacy without involving patients or prescriptions, **CASSANDRA RIVERA** told **JASON W. SMITH** that she assumed "they [Chrisco] had patients and some, you know, some side hustle, but [no] [pre]script[ions]?" **SMITH** agreed that was "stupid."

54. From in or around April 2018, through in or around December 2021, **CASSANDRA RIVERA** facilitated sales to Chrisco of over 900,000 hydrocodone 10-325 mg pills and over 1,000,000 oxycodone 30 mg pills from Wholesaler B; and, from Wholesaler C, **RIVERA** facilitated sales of over 600,000 hydrocodone 10-325 mg pills and nearly 350,000 oxycodone 30 mg pills. Chrisco sold all of those pills, in bulk, to drug traffickers in the Houston area, without requiring prescriptions as required by law.

### Pharmacy A

55. Pharmacy A was among Proven's Houston area pill-mill pharmacy customers whose accounts **JOSEPH PESSERILLO** handled directly. In that role, **PESSERILLO** used his phone and email to take Pharmacy A's orders for Commonly Abused Prescription Drugs; create non-controlled substance orders on Pharmacy A's behalf to ensure Pharmacy A met Wholesaler A, Wholesaler C, and Salus's ratio requirements; and ensure that Pharmacy A's payments—usually via credit card—reached Wholesaler A, Wholesaler C, and Salus.

56. Between late November 2021 and early December 2021, several distributors, including Salus, cut off sales of controlled drugs to Pharmacy A after receiving a notification from a mutual supplier that Pharmacy A was purchasing the Commonly Abused Prescription Drugs from numerous distributors in troubling patterns.

17

57.     After learning that Salus cut off Pharmacy A, **JASON W. SMITH, CASSANDRA RIVERA**, and **JOSEPH PESSERILLO** discussed how to source Commonly Abused Prescription Drugs to Pharmacy A from Wholesaler A, which had just signed on as a new Proven Distributor. **SMITH** described Pharmacy A as "kind of shady," noting that since opening in August 2021, Pharmacy A had "more usage than a pharmacy that's been open for 10 years." **SMITH** described Pharmacy A's having seven other suppliers as a "problem."

58.     Despite those and other red flags, **JASON W. SMITH** instructed **JOSEPH PESSERILLO** to "[t]ry and get the [Pharmacy A's] order from [Wholesaler C] and try and get the [Pharmacy A's] order with [Wholesaler A] and see if like you can make it up that way. . . so that will make up for the loss until we get another pharmacy." **PESSERILLO** replied, "I think [Wholesaler A] would be good for now."

59.     From in or around April 2021, through in or around February 2022, **JOSEPH PESSERILLO** facilitated sales to Pharmacy A of approximately 19,000 Commonly Abused Opioid Pills, from Proven Distributors Salus, Wholesaler A, and Wholesaler C.

### Pharmacy B

60.     Pharmacy B was among Proven's Houston area pill-mill pharmacy customers whose accounts **JOSEPH PESSERILLO** handled directly. In that role, **PESSERILLO** used his phone and email to take Pharmacy B's orders for Commonly Abused Prescription Drugs; create non-controlled substance orders on Pharmacy B's behalf to ensure Pharmacy B met Wholesaler C's ratio requirements; and ensure that Pharmacy B's payments—usually via credit card—reached Wholesaler C.

61.     **JOSEPH PESSERILLO** and **JASON W. SMITH** knew and understood that Wholesaler B cut off Pharmacy B in 2019 for what Wholesaler B characterized as "'TRINITY' or

'COCKTAIL[' prescriptions]" (uppercase in original)—a reference to same-day prescriptions for an opioid and one or more of the Potentiators, a prescribing pattern which **PESSERILLO** and **SMITH** knew and understood was a red flag for diversion.

62.     Despite that and other red flags suggesting that Pharmacy B was diverting the Commonly Abused Prescription Drugs it purchased from Wholesaler C, **JOSEPH PESSERILLO** facilitated sales of the Commonly Abused Prescription Drugs from Wholesaler C until Pharmacy B shuttered in May 2021, after federal agents executed a search warrant at Pharmacy B related to Pharmacy B's suspected pill-mill activity.

63.     From in or around April 2020, through in or around May 2021, **JOSEPH PESSERILLO** facilitated sales of approximately 65,000 Commonly Abused Opioid pills to Pharmacy B from Wholesaler C.

### K Med

64.     K Med was among Proven's Houston area pill-mill pharmacy customers whose accounts **JOSEPH PESSERILLO** handled directly. In that role, **PESSERILLO** used his phone and email to take K Med's orders for Commonly Abused Prescription Drugs; create non-controlled substance orders on K Med's behalf to ensure K Med met Wholesaler A, Wholesaler B, and Wholesaler C's ratio requirements; and ensure that Pharmacy B's payments—usually via credit card—reached Wholesalers A, B, and C.

65.     **JASON W. SMITH** and **JOSEPH PESSERILLO** knew that Wholesaler B cut K Med off in 2019, due to significant discrepancies that Wholesaler B observed in what K Med reported purchasing and what it reported dispensing.

66.     Despite those and other red flags, **JOSEPH PESSERILLO** continued to facilitate sales of controlled substances to K Med from Wholesaler C and, later, from both Wholesaler C

19

and Wholesaler A, simultaneously. **JASON W. SMITH** and **PESSERILLO** knew and understood that by ferrying K Med from distributor to distributor, Proven was facilitating K Med's acquisition of Commonly Abused Prescription Drugs for the purpose of diverting them. As **SMITH** said to **PESSERILLO** over the phone on December 8, 2021, "Us [sic] as reps are still held to a standard, you can't just play the 'I'm stupid, I'm a rep' card."

67.     From in or around July 2018, through in or around December 2021, **JOSEPH PESSERILLO** facilitated K Med's purchase of approximately 251,500 Commonly Abused Opioid pills, as follows: 98,300 from Wholesaler B from July 2018 through August 2019, when Wholesaler B cut off K Med; 138,700 from Wholesaler C from July 2018 through December 2021, when Wholesaler C last sold to the pharmacy; and 14,500 from Wholesaler A in 2021. Like Chrisco, K Med "back-door" distributed the Commonly Abused Prescription Drugs purchased from Wholesalers A, B, and C, in bulk, directly to drug dealers.

### COUNT 1
**Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances**
**(21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))**

1.     The General Allegations section of this Information is re-alleged and incorporated by reference as if fully set forth herein.

2.     From in or around April 2015, and continuing through in or around February 2022, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JASON W. SMITH,**

did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the United States Attorney, to distribute and dispense, and to possess with the intent to distribute and dispense, a controlled substance, in a manner that **JASON W. SMITH** and his

20

co-conspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that the controlled substances involved in this conspiracy attributable to the defendant as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, were mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances.

## COUNT 2
**Conspiracy to Use a Communications Facility to Further the Commission
of a Felony Controlled Substance Offense
(21 U.S.C. § 846, 21 U.S.C. § 843(b))**

1.     Paragraphs 1 through 20, 22, 25, 26, 29, 33 through 35, 47, and 50 through 66 of the General Allegations section of this Information are re-alleged and incorporated by reference as if fully set forth herein.

2.     Beginning in or around August 2019, and continuing through in or around February 2022, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**JOSEPH PESSERILLO and
CASSSANDRA RIVERA,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the United States Attorney, to knowingly and intentionally use a communication facility, that is, a telephone and email, in committing, causing, and facilitating a felony under Title 21, United States Code, Section 846, that is, conspiracy to unlawfully distribute and dispense, and possess with intent to distribute, controlled substances, as alleged in Count 1 of this Information, in violation of Title 21, United States Code, Section 843(b); all in violation of Title 21, United States Code, Section 846.

21

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that the controlled substances involved in this conspiracy attributable to the defendants as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to them, were mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances.

## FORFEITURE ALLEGATIONS

1.      The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants, **JASON W. SMITH, JOSEPH PESSERILLO**, and **CASSANDRA RIVERA** have an interest.

2.      Upon conviction of a violation of Title 21, United States Code, Section 846, as alleged in this Information, the defendants shall forfeit to the United States any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such offense, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense, pursuant to Title 21, United States Code, Section 853.

3.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, a sum that represents the total amount of funds involved in or derived from the alleged offenses and may be sought as a forfeiture money judgment.

4.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

22

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without

difficulty,

the United States shall be entitled to the forfeiture of substitute property under the provisions of

Title 21, United States Code, Section 853(p).

All pursuant to Title 21, United States Code, Section 853.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA


GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

DREW PENNEBAKER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**24-60187-CR-DIMITROULEAS/HUNT**

**UNITED STATES OF AMERICA**

CASE NO.: _____

**v.**

**CERTIFICATE OF TRIAL ATTORNEY**

JASON W. SMITH, et al.,

_____/
                    Defendants.

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☒ FTL    ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No__
   List language and/or dialect: _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I    ☒ 0 to 5 days        ☐ Petty
   II   ☐ 6 to 10 days       ☐ Minor
   III  ☐ 11 to 20 days      ☐ Misdemeanor
   IV   ☐ 21 to 60 days      ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No__
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) No__
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No__
   If yes, Judge _____ Case No. _____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No__

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No__

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No__

15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No__

16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No__

By: _____
    ANDREW PENNEBAKER
    DOJ Trial Attorney
    Court ID No.    A5503256

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** _____ **JASON W. SMITH** _____

**Case No:** _____

Count #:   1

Title 21, United States Code, Sections 846 and 841(a)(1) _____

Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, _____
Controlled Substances
* **Max. Term of Imprisonment:**   20 years
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:**   3 years to life
* **Max. Fine:**   $1 Million

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** _____ **CASSANDRA RIVERA** _____

**Case No:** _____

Count #:   2

Title 21, United States Code, Sections 846 and 843(b)

Conspiracy to Use a Communications Facility to Further the Commission of a Felony Controlled Substance Offense

* **Max. Term of Imprisonment:   4 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   1 year**
* **Max. Fine:   $250,000**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**  **JOSEPH PESSERILLO**

**Case No:** _____

Count #:   2

Title 21, United States Code, Sections 846 and 843(b)

Conspiracy to Use a Communications Facility to Further the Commission of a Felony Controlled Substance Offense

* **Max. Term of Imprisonment:**   4 years
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:**   1 year
* **Max. Fine:**   $250,000

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | **24-60187-CR-DIMITROULEAS/HUNT** |
| Jason W. Smith, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Cassandra Rivera, | ) | **24-60187-CR-DIMITROULEAS/HUNT** |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.


Date: _____

_____
*Defendant's signature*


_____
*Signature of defendant's attorney*


_____
*Printed name of defendant's attorney*


_____
*Judge's signature*


_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Joseph Pesserillo, | ) | **24-60187-CR-DIMITROULEAS/HUNT** |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*