UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-6018-CR-DIMITROULEAS

UNITED STATES OF AMERICA

v.

JASON W. SMITH,

Defendant.

_____/

## AGREED FACTUAL BASIS FOR GUILTY PLEA

Jason W. Smith ("Defendant") hereby acknowledges that, if this case were to go to trial, the United States would establish the following facts beyond a reasonable doubt:

From in or around June 2018, and continuing through in or around February 2022, in the Southern District of Florida, and elsewhere, the Defendant did knowingly and willfully combine, conspire, confederate, and agree with individuals affiliated with certain wholesalers, including Wholesaler 1 and Wholesaler 2 (collectively, the "Wholesalers"), individuals affiliated with Pharmacy 1, Sales Representative 1, and others to distribute and dispense controlled substances, including oxycodone and hydrocodone, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(C).

The Defendant has spent his entire career in pharmaceutical sales. He initially started as a sales representative for a pharmaceutical distributor in 1999, selling injectables and medical supplies to doctors. In around 2012, the Defendant formed his own consulting company with partners, which facilitated the sale of controlled and non-controlled pharmaceutical drugs between wholesalers, and doctors and pharmacies. In 2013, the Defendant formed Proven Rx Sales LLC

1

("Proven Rx"). Through Proven Rx, the Defendant made millions in commission payments from the Wholesalers, who were willing to pay the Defendant to source the sale of controlled substances to Pharmacy 1, discussed here, and others in the Houston, Texas area ("other Houston Accounts"). Although the Wholesalers were located outside the Houston, Texas area, nearly all Proven Rx's accounts that purchased hydrocodone and oxycodone from the Wholesalers—including Pharmacy 1—were located in the Houston, Texas area.

The profits the Defendant generated for the Wholesalers were driven by sales, at over-market prices, of generic pharmaceutical opioids and other frequently diverted controlled pharmaceutical drugs to Pharmacy 1 and to other Houston Accounts. Proven Rx's pharmacy accounts, including Pharmacy 1 and other Houston Accounts, who were the Wholesalers' customers, were willing to pay large premiums for certain controlled drugs because of their substantial resale value on the black market, in particular, hydrocodone 10-325mg and oxycodone 30mg, which often sold for $1 per milligram on the black market. The Defendant and the Wholesalers knew that Pharmacy 1 and other Houston Accounts would pay large premiums for these drugs, in part, because legitimate wholesalers charging market rates for the drugs would not do business with them. For facilitating sales to the Pharmacy 1 and other Houston Accounts, the Defendant paid Sales Representative 1 a salary and discretionary bonuses that were not specifically tied to volume.

The Wholesalers, Pharmacy 1, and many of the other Houston Accounts, exhibited numerous red flags of drug diversion. Those red flags included, among others: (1) substantially all of the Schedule II controlled drugs purchased and sold were the highest strength, quick-release generic pill forms of oxycodone (the 30mg tablet) and hydrocodone (the 10-325mg tablet)—i.e., the ones that sold for the most money on the black market; (2) substantially all of the Schedule III-

2

V controlled drugs purchased and sold were carisoprodol 350mg ("Somas" or "circles"), alprazolam 2mg ("bars" or "handlebars"), and promethazine with codeine syrup ("lean," "drank," "oil," or "syrup")—i.e., the ones that sold for the most money on the black market; (3) Pharmacy 1 and other Houston Accounts were forced by the Wholesalers to purchase non-controlled and controlled drugs in a ratio that was determined by the Wholesalers, even though Proven Rx and the Wholesalers knew that Pharmacy 1 and the other Houston Accounts often neither needed nor wanted the non-controlled drugs; and (4) the Wholesalers charged, and Pharmacy 1 and other Houston Accounts were willing to pay, prices well above market rates—i.e., Pharmacy 1 and the other Houston Accounts paid the Wholesalers, especially for oxycodone, more at the *wholesale* level than what insurance providers would reimburse at the *retail* level, which meant that Pharmacy 1 and the other Houston Accounts took mostly, or only, self-pay (cash).

The Defendant and Sales Representative 1 often discussed the scheme. For example, on a call that took place on December 2, 2021, the Defendant and Sales Representative 1 characterized amounts of hydrocodone and oxycodone that Pharmacy 1 purchased from Wholesaler 1 (which Proven Rx no longer represented at the time) and Wholesaler 2 (which Proven Rx did represent at the time) as excessive. Yet, the Defendant and Sales Representative 1 discussed signing up Pharmacy 1 with *additional* wholesalers Proven Rx represented. On the call, Sales Representative 1 asked the Defendant of Pharmacy 1's demand for controlled drugs, "When has it ever been enough?" and continued, "I have this feeling they [Pharmacy 1] weren't going to stop ordering from anyone [laughing]."

Another conversation between Sales Representative 1 and the Defendant revealed that the Defendant and Wholesaler 2 were well-aware that Pharmacy 1 purchased non-controlled drugs from Wholesaler 2 only as a means to obtain as much hydrocodone 10-325mg and oxycodone

3

30mg as possible: Sales Representative 1 recounted to the Defendant telling the President of Wholesaler 2 that Pharmacy 1 was refusing to purchase the controlled drugs allotted for the month because "[h]e [Pharmacy 1] just can't do nothing with those 400,000 nons [non-controlled drugs] we send …. He says he has no space, especially if he has to do … that inventory. I was like that… that's the problem." The Defendant and Sales Representative 1 knew that statement to be false; and the Defendant, Sales Representative 1, and the President of Wholesaler 2 all knew that Pharmacy 1's lack of interest in non-controlled drugs, which he was required to accept to comply with Wholesaler 2's ratios, was a red flag for diversion.

In total, the Defendant was responsible for conspiring to unlawfully dispense and distribute to, among others, Pharmacy 1 approximately 684,000 hydrocodone 10-325mg pills and 681,000 oxycodone 30mg pills from Wholesaler 1, and 603,000 hydrocodone 10-325mg pills and 349,000 oxycodone 30mg pills from Wholesaler 2.

The preceding statement is a summary, made for the purpose of providing the Court a factual basis for my guilty plea to the charges against me. It does not include all the facts known to me concerning the criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

Date: 9-30-24    By: _____
JASON W. SMITH
Defendant

Date: 9-30-24    By: _____
MARC NURIK
Counsel for Defendant

Date: 9/30/24    By: _____
ANDREW PENNEBAKER
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section

4