**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:24-60187-CR-WPD**

**UNITED STATES OF AMERICA**,

*v*.

**JASON SMITH**,

   *Defendant*.

_____/

## DEFENDANT JASON SMITH'S SENTENCING MEMORANDUM

Defendant, Jason Smith, through undersigned counsel files the following Sentencing Memorandum for the purpose of aiding this Court in its determination of a just and appropriate sentence in this matter

## I.   INTRODUCTION

The man who stands before the Court for sentencing is in many ways not the same person who committed the crimes years ago. At that time, he was focused on making as much money as possible, due in part to his gambling addiction, whereas Jason Smith, who now stands before this Court has done everything in his power to make amends by unselfishly cooperating with the Government to his financial detriment and living as a law abiding, contributing member of his community.  From the moment he was contacted by law enforcement he acknowledged his guilt and began cooperating with the Government in a manner which has been termed "exceptional".  He overcame his gambling addiction which only fueled his greed and has endured many financial setbacks as a result of his cooperation.  He has become a contributing member in his community and has been diligently working selling home security system for a major

1

company for the last 22 months.  Now, he is not only facing prison but is also experiencing serious medical issues which are worsening by the day.  Defendant respectfully requests that this Court heed the Government's 5K1.1 recommendation and look to comparable sentences for similar conduct in fashioning the just and appropriate sentence in this matter.

## II.   SENTENCING FACTORS UNDER 18 USC § 3553

### A.   NATURE AND CIRCUMSTANCES OF OFFENSE

Jason Smith has accepted full responsibility for his criminal conduct and does not seek to minimize the seriousness of his conduct.  He does request that this Court consider one undisputed matter in mitigation.

During much of the relevant time, Jason Smith suffered from a serious gambling addiction, playing slot machines on a daily basis, which further fueled his desire to make as much money as possible to gamble. During 2018 and 2019 alone, Jason Smith lost almost 1.2 million dollars on slot machines at the Dania Beach Casino. **(*See* Exh. "A")** Only because of Covid shutting down Casinos and other gambling opportunities (sporting events, card games etc.) was Defendant forced to break free of his addictive behavior. While this does not in any way excuse his conduct, it does offer a partial explanation for the Court why he was so willing to engage in conduct that was not representative of his true character.

### B.   HISTORY AND CHARACTERISTICS OF DEFENDANT

#### 1.   Jason Smith's character

In addition to Jason Smith's strong family background and roots in the local Broward County community, as set forth in the PSR, Jason's positive attributes as a loving family man, friend and contributing to the community as mentioned in the 25-character letters attached as Composite **(*See* Exh. "B")** Every letter provided paints the

picture of a man, rehabilitated, unselfishly devoted to his family, his friends and his faith.

Rather than burden this Court with a recitation of each, the following excerpts from several letters best exemplify his positive change, expressions of remorse, efforts on behalf of others and speak for the others who wrote to the Court.  In her letter, Jason's eldest sister Rebecca Boissman writes:

> "I have been amazed by my brother's response. He took responsibility for his actions before God, his family and the Government. He has lost everything that most people would think matter: his business, his home, many of his friends, and much more. What he has gained is time and perspective. I have been awed by his response. Many men in his situation would lie, scheme or possibly hurt themselves rather than face the situation head on trying to right the wrong. Instead, Jason joined our church at a retirement home helping the elderly do crafts.  He has since then fed the homeless and is on the welcome committee at the church."

Jason's close friend, Scott Dangora writes in his letter the following about Jason's acceptance of responsibility and commitment to assist the government make positive changes in the pharmaceutical industry:

> "I've not heard him placing blame, but rather looking retrospectively, assessing what has transpired, what needs to change in the industry, and what he wished he had done earlier on to effect that change... He is purposing to use whatever valuable time he is given for good. Especially as he seeks positive change in the very broken and corrupt prescription drug industry. His vast industry knowledge and his work with law enforcement have been taking impactful steps in being part of the solution."

A theme that is repeated in every letter written is best stated by Jason's friends Courtney and Joey Venditti who wrote:

> "Beyond being a husband, father, and friend, Jason is a model

citizen and neighbor. His commitment to making our community a better place is evident in the way he treats everyone with respect and kindness. He embodies what it means to be a good human being: someone who cares deeply for others and strives to make the world around him a little better place"

The principal at Parkway Christian School, Nicole F. Koski writes:

"Over the years, I have witnessed Mr. Smith as a dedicated and involved father.  The bond between Jason and his son, Jeter, is like no other that I have seen. In addition, from my perspective as a school principal, Mr. Smith is the kind of parent who will do anything the school needs. There has never been a doubt of his servant heart and his dedication to his family-which includes the extended school family that we foster at Parkway Christian School"

Pastor Tim Gray of the Community Christian church writes the following about Jason's efforts in helping the church community:

"Jason Smith and his family have been involved here at Community Christian Church since the fall of 2022 … Jason has been involved with our Community Msn small groups study on Tuesday nights and was baptized here last fall… Jason has also served as a greeter and auditorium host, giving his time and attention to others to help them have a meaningful worship experience.  Jason has also served numerous times with our outreach team, serving alongside other church members to help those in the south Florida Community."

## 2.  Jason Smith's Medical condition

Jason Smith suffers from several serious medical conditions which have worsened over time, leaving him vulnerable to major complications.  As the PSR notes, Jason has been diagnosed with chronic kidney disease and IBS (irritable bowel syndrome).  In addition, he has a history of cardiac disease as reflected in a 2022 letter (*See* Exh. "C") from Dr. David Steinman which states that Jason:

"has an extensive history of tachycardia, ventricular premature beats,

mitral valve regurgitation, hypertension, premature atrial contraction,

4

precordial pain and arteriosclerosis in native artery" (*See* **Exh. "C"**)

Dr. Steinman also noted mild obstructions in several arteries.  Dr. Steinman continues to monitor Jason's condition

As stated in the PSR, Jason Smith has stage 3 chronic kidney disease.  This condition is worsening over time.  In a letter dated August 7, 2025. (*See* **Exh. "D"**). Dr. Jorge Luis De Ajuria, Jason Smith's treating Nephrologist, notes the following:

> "Mr. Smith requires close monitoring of renal function and proteinuria for evidence of progression of chronic kidney disease and loss of renal function.  Current management is RAAS blockade, should he develop acute deterioration of kidney function, he would require aggressive immunosuppression to prevent the need for hemodialysis."

Jason's IBS has recently acted up causing him to be scheduled for an endoscopy at the Cleveland Clinic on September 15, 2025. (*See* **Exh. "E"**).

The PSR also mentions that Jason is under the care of his primary care physician Dr. Jarrod Frydman.  As Dr. Frydman has left the practice, his overall care is currently being monitored at My Care Medical in Plantation Florida.  Due to his multiple medical conditions, he is scheduled for visits every three months.  (*See* **Exh. "F"**)

In light of Jason Smith's multiple medical problems which threaten to progress, it is submitted that any long-term incarceration would create a serious threat to his health and create an unnecessary burden on the prison health system.

### C.   <u>NEED FOR INDIVIDUAL DETERRENCE AND REHABILITATION</u>

The Government agrees that in every respect Jason Smith has fully rehabilitated himself in more than 3 years since the end of his criminal conduct.  Jason has shown great remorse for his conduct, has changed his life around, contributed to his community.  For the last 19 months has and has worked tirelessly with the Government to help clean up an industry rife with illegal behavior.  He has demonstrated a firm commitment to living a

law-abiding life and working for others in the community.  There is no doubt on the part of the agents and prosecutors that Jason Smith does not pose a risk of recidivism.

## D.     THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

There are two recent cases involving pharmaceutical distributors, who were prosecuted for conspiracy to distribute opioids and/or fentanyl involving even more egregious conduct, which provide some comparisons for assisting the Court to avoid unwarranted sentencing disparities in fashioning the appropriate sentence here.

In *United States v. Doud,* 19-Cr-285, Southern District of New York, Defendant Lawrence Doud, the CEO of Rochester Drug Co-Operative (RDC), one of the largest pharmaceutical distributors, was found guilty after trial of distributing, through RDC, dangerous, highly addictive opioids to pharmacy customers that he knew were being sold and used illicitly.  At the direction of its senior management, including *DOUD*, RDC supplied large quantities of oxycodone, fentanyl, and other dangerous opioids to pharmacy customers that its own compliance personnel determined were dispensing those drugs to individuals who had no legitimate medical need for them.  Despite a guideline calculation of 360-life and the Government's recommendation of 180 months incarceration, the District Judge sentenced Doud to **27 months incarceration**.

In Doud, the sentencing Judge found that. while the amount of opioids and fentanyl was staggering the Court determined that it would be illogical and unfair to conclude that the defendant would be aware that every drug distributed went to illegal use or diversion. It was sufficient that the Defendant would know that some of the drugs were used in that manner to support a finding of guilt on the conspiracy to distribute counts.   However, the Judge noted given the fact that pharmacies would fill prescriptions, some, if not many of which, would be for legitimate purposes. At sentencing the Court found:

"It was not reasonable to conclude that all quantities of those drugs would go to the wrong hands and be diverted." (TR.18:5, 6)

Defendant Smith respectfully urges this Court to follow the logic of the Judge in Doud in determining the sentence here. This Court is further urged to recognize that Jason Smith, as opposed to Lawrence Doud, immediately accepted responsibility, felt so responsible and committed to right his wrongs that he never challenged the weight for guidelines purposes, pled guilty and began cooperating with the Government in an exceptional fashion.

Notably, in that same case, Rochester Drug Co-operative, the head of compliance, William Pietruszewski, was also charged with the distribution conspiracy as he was not only ware of the illegal distributions but actively participated in concealing the activity from the DEA. Pietruszewski did however plead guilty and cooperated with the government. As a result, he received a non-incarceration sentence (time served, (a day) and 2 years supervised release).

Certainly, it could be argued that Distributors who are subject to the CSA ("Controlled Substances Act"), have affirmative duties to report red flags, are given guidance by the DEA and often are given warnings before being suspended from distribution are held to a higher standard than sales reps. As such, using RDC case as a guidepost, Defendant Smith respectfully urges this Court to sentence him to no more than 27 months incarceration.

Another case for comparison purposes is *Insys Therapeutics, United States v John Kapoor*. Case no. 1:16-cr-10343ADB, Southern District of Ohio. There, defendant Kapoor was the founder and Chairman of Insys Therapeutics a company which manufactured and marketed a fentanyl spray to the medical profession and utilized wholesale distributors to distribute the product to practitioners. In a 79-page indictment Kapoor was charged with Racketeering, Conspiracy, Mail and Wire Fraud involving a

7

scheme to bribe and provide kickbacks to medical practitioners to prescribe the Fentanyl spray without medical necessity, which had dangerous health implications.

There, the insipid scheme was to cause dangerous drugs to be illegally distributed, by virtue of committing additional crimes.  After a 50-day Jury trial, Kapoor and his co-defendants were found guilty. The Judge sentenced Kapoor to 66 months of incarceration, notwithstanding the seriousness of the offense.

Furthermore, to put the Jason Smith's case into perspective, it should be noted that Jason Smith is the first case to date where a sales rep has been charged with conspiracy to distribute, considering that sales reps, unlike distributors, are not subject to the CSA; nor are they given guidance or warnings from the DEA.  The Government would not dispute that despite numerous civil and regulatory actions against pharmaceutical distributors and the very limited criminal prosecutions of pharmaceutical distributors for opioid and fentanyl sales, up until now, sales reps who were aware and participated in facilitating unlawful sales of excessive amounts of these drugs were not charged and, in many instances, were simply used as witnesses.[1]

In addition, there is an extensive history of lenient Government treatment of major pharmaceutical distributors of opioids whose illegal conduct were long term and dwarfed the conduct of the defendant here.  In many of these cases the Distributors ignored warnings from the DEA, did not admit to there illegal conduct, and continued shipping excessive amounts of opioids to pharmacies knowing of their illegal usage.

One of the most blatant examples involves Morris & Dickson, at the time the fourth largest distributor of Opioids.  Since January 2014, DEA Diversion agents identified more than 12,000 allegedly suspicious retail pharmacy orders that should have been reported.  Of all the cases I handled as an administrative law judge for the DEA, Morris & Dickson's violations were the most blatant and egregious," Judge

---

[1] There are many examples too numerous to list where sales reps were not charged even though they had specific knowledge of the illegal nature of the distribution such, For example RDC, Purdue Pharma, EMED, Morris and Dickson, Harvard Drugs.

Charles Dorman stated.  Yet, the only sanction was temporary revocation of several licenses of license, not criminal prosecution.

Even more troubling is the matter of Miami Luken, a major distributor of opioids, who was indicted along with two principals, for excessive shipments of opioids to more than 200 pharmacies in Ohio, West Virginia, Indiana and Tennessee.  Inexplicably the Government dismissed their indictment despite the finding that amongst their other egregious conduct, they distributed in a three-year period more than 3.7 million hydrocodone pills to a pharmacy in Kermit West Virginia, a town of 400 people.

The list is extensive of other major pharmaceutical manufacturers and distributors who were given only civil penalties yet were found to be responsible for ignoring the obvious signs of illegal use, failing to heed government warnings and in some cases failing to report suspicious activity or even covering up such activity.  Amongst the companies on this list are major players such as Harvard Drugs, Purdue Pharma, AmerisourceBergen and McKesson.

The point to be made from all of this is that Jason Smith is the first and only Participant in the pharmaceutical industry who has come forward and immediately admitted his wrongful conduct, pled guilty to criminal charges and has cooperated extensively with the Government making enormous efforts towards cleaning up a troubling pattern of abuse in the pharmaceutical industry's distribution of opioids and other controlled medications.  It is respectfully submitted that if anyone deserves leniency it is Jason Smith, who has truly earned it.

**III.    OTHER GROUNDS FOR MITIGATION OF SENTENCE**

     **A.    DEFENDANT'S EXCEPTIONAL COOPERATION**

According to the Government, Jason Smith's cooperation has been nothing short of exceptional and invaluable.  In its prior filings with this Court and in its Sentencing Memorandum, the Government sets forth in detail the full nature and extent of Jason

Smith's extensive cooperation in numerous major investigations in several Federal Districts. Simply to summarize for the Court, in the more than 3 years since he began cooperating, Jason Smith has made hundreds and hundreds of calls and emails to subjects, recorded numerous in person meetings with targets and subjects, spent countless hours meeting with prosecutors and federal agents on the phone and in person, including agents and prosecutors in several other Districts. During these meetings Jason Smith provided and interpreted numerous documents and gave important insights into to the workings and problems in the pharmaceutical wholesale industry relating to the distribution of opioids and other controlled medications.

To facilitate this cooperation, Jason Smith was forced to keep Proven RX open even though its business was now operating at a loss. Having to let his employees go and being the only person working at Proven Rx, Jason Smith was unable to work full time anywhere else to provide sufficient income for his family. As a result, Jason Smith was forced to sell his home and use proceeds to pay ongoing living expenses. Since the beginning of his cooperation, the family has had to move 3 times, each time into a smaller and more affordable apartment.

## IV.   CONCLUSION

Wherefore for the reasons contained herein and those to be argued at sentencing Defendant respectfully requests that this Court sentence Defendant Jason Smith to a period of incarceration not to exceed 24 months.

Respectfully submitted,

*/s/MARC S. NURIK*
Marc S. Nurik, Esq.
Florida Bar No. 0272817
**LAW OFFICES OF MARC S. NURIK**
4800 N. Federal Highway, Suite 205B
Boca Raton, FL 33431
Phone: 310-909-6828
Email: Marc@Nuriklaw.com

*Counsel for Jason Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2025, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record.

By: */s/Marc S. Nurik*
Marc S. Nurik, Esq.
Florida Bar No. 0272817

11